

DA 10-0636

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 164

IN THE MATTER OF:

R.M.T.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DN 08-073
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Joslyn Hunt, Chief Appellate Defender; Shiloh Hernandez, Assistant
Appellate Defender; Helena, Montana

    For Appellee:

        Steve Bullock, Montana Attorney General; Mardell Ployhar, Assistant
Attorney General, Helena, Montana

        Scott Twito, Yellowstone County Attorney; Rick Helm, Deputy County
Attorney, Billings, Montana

    For Guardian Ad Litem:

        Judy A. Williams, Goodrich Law Firm, Billings, Montana

Submitted on Briefs:  May 25, 2011
Decided:  July 11, 2011

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     J.A. appeals from an order of the Thirteenth Judicial District Court, Yellowstone County, that terminates his parental rights.  We affirm.

¶2     We review the following issues on appeal:

¶3     *Whether the District Court abused its discretion when it terminated J.A.'s parental rights.*

¶4     *Whether the District Court violated J.A.'s due process rights when the court refused J.A.'s request to cross-examine the guardian ad litem at the termination hearing.*

## FACTUAL AND PROCEDURAL HISTORY

¶5     R.M.T.'s mother, K.T. (Mother), abused or neglected him most of his life.  R.M.T.'s biological father, J.A. (Father), left Mother before R.M.T.'s birth.  Father lives in Vermont.

¶6     R.M.T. lived in Laurel, Montana, with Mother.  Father claims that he did not know that he had a son until 2005 when the Montana Department of Public Health and Human Services, Child and Family Services Division (Department) first garnished his wages for child support.  R.M.T. was approximately eleven years old at that time.   Father continued to pay child support.  Father also provided R.M.T. with health insurance from 2005 through 2010 when the District Court terminated his parental rights.

¶7     Mother called Father in 2007 to tell him R.M.T. had been hospitalized after an accident.  Father still had no contact with R.M.T. until the Department began proceedings to adjudicate R.M.T. a youth in need of care in 2008.  Father claims that he could not locate

2

R.M.T. until that time. Father also admits, however, that he did not attempt to get any contact information from Mother when she called him in 2007 about R.M.T.'s accident.

¶8 R.M.T. was fourteen when he first met Father in 2008. R.M.T. and Father spent several days together in Montana. Father visited R.M.T. in Montana one other time when he returned in 2010 for the hearing to adjudicate Father's parental rights. R.M.T. was sixteen.

**The Adjudication of R.M.T. as a "Youth in Need of Care."**

¶9 The State charged mother with partner or family member assault of R.M.T. in 2007. R.M.T. moved in with Conn and Debra Hellebust (Hellebusts) on a farm outside of Havre while Mother spent time incarcerated. Hellebusts' son, Kane, had dated Mother. R.M.T. thinks of Kane as his Father. R.M.T. considers Hellebusts his grandparents even though they are not biologically related to him. R.M.T. spent one school year with Hellebusts before returning home to Laurel with Mother.

¶10 R.M.T. went to the Yellowstone County Attorney's office for help shortly after returning to Mother's home in Laurel in July of 2008. R.M.T. feared that Mother's abuse would continue. R.M.T. had just turned fourteen. R.M.T. reported Mother often would return home drunk and that she had hit him in the past. A social worker with the Department confirmed R.M.T.'s allegations. The District Court granted emergency protective services. The Department placed R.M.T. with his maternal uncle in Laurel.

¶11 The court also appointed a guardian ad litem (GAL) pursuant to §§ 41-3-112 and -425(2)(b), MCA. The GAL served as R.M.T.'s attorney in accordance with practice in Yellowstone County. The court assigned counsel to Mother and Father.

3

¶12    Father's counsel had not located Father before the initial show cause hearing in August 2008.  Father traveled to Montana from Vermont for a subsequent hearing on October 7, 2008.  Father indicated at the hearing that he would like the Department to consider him as a potential placement for R.M.T.  Father later admitted to smelling of alcohol at the hearing.  Father met fourteen-year-old R.M.T. for the first time during this trip.

¶13    Father stipulated that R.M.T. qualified as a youth in need of care.  The District Court adjudicated R.M.T. a youth in need of care and granted the Department temporary legal custody on October 28, 2008.  The court told Father to work with R.M.T.'s social worker, Joe Gradney (Gradney), in order to establish a relationship with R.M.T.

¶14    The court approved a treatment plan for Father in February of 2009.  The treatment plan first required Father to provide a safe, sober, and stable home environment.  The plan required Father to attend age-appropriate parenting classes and to develop a relationship with R.M.T.  The plan also required Father to complete a psychological evaluation and to maintain monthly contact with Gradney.  The plan's final goal required Father to write a personal history.

¶15    The Department requested an extension of temporary legal custody in April of 2009.  Father had not made any progress on his treatment plan.  Father had not maintained regular contact with R.M.T. or Gradney.  Father had attempted to call R.M.T. a few times, but claimed that he had been unable to reach R.M.T.  Father appeared by phone at the April 2009 hearing and stipulated to an extension of temporary legal custody.

4

¶16    The Department requested a permanency plan hearing in July of 2009. The court held a hearing on the permanency plan in September of 2009. Father's counsel sent him notice of the hearing, but counsel had not heard back from Father. The court approved the permanency plan. The Department placed R.M.T. with his friend's parents in Laurel.

¶17    The court held another hearing for an extension of legal custody in December of 2009. Father's counsel informed Father of the hearing, but counsel again did not hear from Father. The court granted another extension of temporary legal custody on December 22, 2009. R.M.T. had been in the Department's custody for approximately fifteen months by that point. Mother informed Gradney that she did not intend to complete her treatment plan. Gradney had minimal contact with Father.

¶18    Gradney requested a study of R.M.T.'s placement with Father through the Interstate Compact on the Placement of Children (ICPC). The Vermont Department of Children and Families (VDCF) completed the report in February 2010. The VDCF denied permanent placement with Father because he lacked a permanent residence. The report approved Father for unsupervised visits. The report also indicated that Father had been cited for driving under the influence of alcohol in Vermont in 1995 and in 2008. Father also had been charged with domestic assault of an ex-girlfriend in 2004.

**The Termination of J.A.'s Parental Rights.**

¶19    The Department petitioned for termination of Father's and Mother's parental rights in June 2010. R.M.T. had been in the Department's custody for almost two years. Gradney alleged that both parents had failed to comply with their treatment plans. Father had not

maintained regular contact with R.M.T. or Gradney. The court held the hearing on the Department's petition on August 31, 2010, and September 3, 2010. Father traveled from Vermont to attend the hearing.

¶20 In the meantime R.M.T. had moved to Havre to live with Hellebusts. R.M.T. wanted to remain with Hellebusts. R.M.T. informed the court that he did not care whether the court terminated Father's parental rights. R.M.T. told the court that he had seen Father only once in the past two years. R.M.T. requested, however, that the Department allow him to continue to develop a relationship with Father. Father agreed that R.M.T. should continue to live with Hellebusts.

¶21 Father admitted at the hearing that he had not completed his treatment plan. Father claimed that he had problems accessing his treatment plan. The Department confirmed, however, that Father received a copy of the plan in April of 2009 shortly after he had requested it from his counsel. Gradney and a social worker in Vermont both discussed the treatment plan with Father. Father also discussed the treatment plan with a counselor in Vermont. Father understood the treatment plan. Father admitted that he had decided to "take a better look at [the] treatment plan" about two to three weeks before the termination hearing.

¶22 Father ultimately failed to complete many of the tasks on his treatment plan. VDCF reported that Father had not maintained an adequate home. Father testified at the termination hearing that he had obtained permanent housing with his girlfriend and her children since VDCF had filed its report. The District Court stated in its oral ruling that Father had

6

completed this part of the plan's first goal that required him to provide a stable home. This goal also required Father, however, to maintain a home free of alcohol. The court did not have enough information to determine whether Father's home remained alcohol free.

¶23 The plan's second goal required Father to attend age-appropriate parenting classes. Father attended no parenting classes. This goal also required Father to develop a relationship with R.M.T. Gradney testified that Father had not satisfied this task. Gradney expressed concerns about Father's commitment to R.M.T. Father testified that he had gone to great lengths to build a relationship with R.M.T. Father highlighted the fact that he had traveled from Vermont to Montana on two separate occasions despite his limited budget. Father purchased a cell phone for R.M.T. the week before the termination hearing in order to make it easier to communicate. The court considered the telephone calls, however, "a long way from making best efforts to develop a relationship."

¶24 The plan's next goal required Father to call Gradney monthly to discuss his progress on the treatment plan. Father had not complied with this task. Father did not return Gradney's phone calls. Father offered no explanation as to why he had failed to communicate with Gradney. Finally, the plan's final goal required Father to write a personal history. Father failed to write a history. The court noted the relatively simple nature of this task.

¶25 The court recognized that Father's piecemeal attempts to comply with his treatment plan failed to reach the level necessary to complete his treatment plan. The court determined

7

that the termination of Father's parental rights was in R.M.T.'s best interest. The court terminated both Father's and Mother's parental rights. Father appeals.

## STANDARD OF REVIEW

¶26 We review for an abuse of discretion a district court's termination of parental rights. *In re J.M.*, 2009 MT 332, ¶ 12, 353 Mont. 64, 218 P.3d 1213. A district court abuses its discretion when it "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *Id.*

¶27 The district court must protect a parent's fundamental right to the care and custody of a child through fundamentally fair procedures. *In re D.B.*, 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. The State must present clear and convincing evidence that the statutory circumstances allowing the court to terminate parental rights exist. *Id.* at ¶ 18. The district court must address adequately each applicable statutory requirement before terminating parental rights. *Id.* at ¶ 17. We review for clear error the district court's findings of fact regarding the statutory criteria. *In re A.J.E.*, 2006 MT 41, ¶ 21, 331 Mont. 198, 130 P.3d 612.

## DISCUSSION

¶28 *Whether the District Court abused its discretion when it terminated J.A.'s parental rights.*

¶29 A district court may terminate parental rights if (1) the court has adjudicated the child a youth in need of care, (2) the parent has failed to comply with a court ordered treatment

8

plan, and (3) the conduct or condition of the parent rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA; *In re I.B.*, 2011 MT 82, ¶ 25, 360 Mont. 132, ___ P.3d ___, 2011 Mont. LEXIS 115 (April 20, 2011). Father concedes that the District Court properly adjudicated R.M.T. a youth in need of care and that he failed to complete successfully his treatment plan.

¶30 Father argues that the court abused its discretion in terminating his parental rights, however, because it failed to address adequately whether "the conduct or condition of [Father] rendering him unfit is unlikely to change in a reasonable time." Section 41-3-609(1)(f)(ii), MCA. Father more specifically argues that the court failed to make the appropriate findings regarding Father's fitness under § 41-3-609(2), MCA.

¶31 Section 41-3-609(2), MCA, requires the court to make specific findings regarding whether the conduct or condition rendering Father unfit is unlikely to change. The court must find that (1) continuation of the parent-child relationship likely will result in continued abuse or neglect, or (2) the conduct or condition of the parent renders the parent unfit, unable, or unwilling to give the child adequate parental care. Section 41-3-609(2), MCA. The court must consider a variety of factors to satisfy § 41-3-609(2), MCA. These factors include any emotional or mental illnesses that render the parent unable to care for the child, any history of violent behavior by the parent, excessive use of alcohol or drugs, the parent's incarceration if applicable, and any other relevant evidence. Section 41-3-609(2)(a)-(d), MCA. The statute does not require the court to make specific findings regarding each factor. *Id.*

9

¶32    The court found that Father had failed to obtain a psychological evaluation that would have provided the Department with information regarding any emotional or mental illnesses. Section 41-3-609(2)(a), MCA. Father's failure to complete this part of the treatment plan prevented the Department from making any determination about Father's mental health. The court also discussed evidence of Father's past violent behavior. Section 41-3-609(b), MCA. The court noted Father's history of alcohol abuse. Father admitted that he was an alcoholic. Father received his second DUI in 2008. Section 41-3-609(2)(c), MCA. The court properly considered the factors listed in § 41-3-609(2)(a)-(c), MCA.

¶33    The court also specifically found (1) that the conduct or condition of Father is unlikely to change in a reasonable time, (2) that continuation of the parent-child relationship between Father and R.M.T. likely would result in continued abuse or neglect, and (3) that Father's conduct renders him unfit, unable, or unwilling to provide R.M.T. with adequate parental care. Section 41-3-609(2), MCA. The court made the necessary findings pursuant to § 41-3-609(2), MCA.

¶34    Father argues that the court's findings do not satisfy the statutory requirements, however, because they merely restate the statutory language and lack any fact specific analysis regarding Father's fitness. The District Court's findings, to the contrary, extensively discuss Father's inability to establish a parent-child relationship with R.M.T. and his inability to provide R.M.T. with adequate parental care. The court found that Father had failed to establish a relationship with R.M.T. Father acknowledged that failing to establish a

10

relationship with R.M.T. would constitute neglectful conduct. Father claimed, however, that he had established a relationship with R.M.T. R.M.T. and Gradney disagreed.

¶35 R.M.T.'s foster care placements reported to Gradney that Father had not contacted them, despite Father's representations that he had called and left messages. Father had not returned Gradney's calls. Father also failed to communicate with his appointed counsel regarding hearings in this matter. Gradney testified that Father's inability to develop a relationship with R.M.T. constituted neglect.

¶36 The District Court telephoned R.M.T. at Havre High School the day of the trial. The court reported that R.M.T. considered Hellebusts his only family. R.M.T. told the court that he had seen Father only once in the past two years—when he came to town for the termination hearing. Father had given R.M.T. a cell phone the week of the termination hearing. The court noted that Father had made an effort, but characterized his effort as "too little, too late."

¶37 The court's findings also indicate that Father proved unable to provide R.M.T. with adequate parental care. Father failed to complete relatively simple tasks—like writing a personal history—in order to prevent the termination of his parental rights. R.M.T. remained in foster care for nearly two years during the pendency of these proceedings. Father admitted that he had decided to take a closer look at the treatment plan only weeks before the termination hearing. Father had not attended any parenting classes. Father suffers from alcoholism and he has committed domestic abuse in the past. Substantial credible evidence

in the record supports the District Court's findings that Father was unable or unwilling to provide R.M.T. with adequate parental care. Section 41-3-609(2), MCA.

¶38 Father points out that Gradney conceded on cross-examination that he was unable to say with certainty whether R.M.T. would suffer abuse and neglect if he lived with Father. Gradney added, however, that he did not have enough information to make this determination because Father had failed to communicate with Gradney. Father cannot benefit from his lack of involvement in this matter. The court may consider Father's past conduct to determine that Father's conduct likely would not change. *In re D.A.*, 2008 MT 247, ¶ 23, 344 Mont. 513, 189 P.3d 631. Father had two years to establish that he could provide adequate parental care to R.M.T. Substantial evidence in the record supports the court's findings that Father's conduct rendering him unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f)(ii), MCA.

¶39 *Whether the District Court violated J.A.'s due process rights when the court declined J.A.'s request to cross-examine the guardian ad litem at the termination hearing.*

¶40 Father sought to remove Judy Williams (Williams), R.M.T.'s GAL, due to Williams's failure to file a report with the court pursuant to § 41-3-112, MCA. The court declined to remove Williams as R.M.T.'s GAL. Father later attempted to call Williams as a witness. Williams objected. The court asked Father to make an offer of proof. Father explained that his only question for Williams was whether she had filed a report. The court declined Father's request.

12

¶41    Williams spent her lunch break that afternoon writing a report for the court. Williams's two page report discussed her communication with R.M.T. about Father. Williams reported that R.M.T. did not feel as though his Father had attempted to establish a relationship with him, and that R.M.T. wanted Father's rights terminated.

¶42    Father then attempted to call Williams as a witness regarding statements that she had made in her report. Williams objected on the grounds that her role in the proceeding as an attorney made it inappropriate for her to testify under the rules of professional conduct. The court declined to allow Father to cross-examine Williams.

¶43    Father argues that Williams filled an investigative role in the proceedings, filed a report, and presented the court with facts. Father claims that he has a due process right to cross-examine Williams under these circumstances. We agree.

¶44    This Court consistently has held that parents have a liberty interest in the care and custody of their children. *Jacobsen v. Thomas*, 2004 MT 273, ¶ 34, 323 Mont. 183, 100 P.3d 106; *In re Krause*, 2001 MT 37, ¶ 19, 304 Mont. 202, 19 P.3d 811. Due process requires the court to afford parties a meaningful opportunity to confront and cross-examine adverse witnesses. *Jacobsen*, ¶ 34. A court violates a party's due process rights if the court relies on a report in a custody proceeding without requiring the author of the report to testify. *Id.* (citing *In re Moyer*, 173 Mont. 208, 211, 567 P.2d 47, 49 (1977)).

¶45    This Court in *Jacobsen* considered whether a party had a right to cross-examine an attorney GAL in a domestic relations case. *Jacobsen*, ¶¶ 19-39. The GAL had submitted several factual reports to the court. *Id.* at ¶¶ 8-9. The district court refused to allow the

13

parties to cross-examine the GAL on the grounds that the rules of professional conduct prohibited attorneys from testifying. *Id.* at ¶¶ 20-21. This Court reversed. The Court reasoned that the GAL's statutory role primarily involved aiding the court in determining the best interest of the child, rather than serving as an attorney for the child. *Id.* at ¶ 32.

¶46    *Jacobsen* addressed the GAL statute in domestic relation cases. Section 40-4-205, MCA. This case involves the GAL statute in abuse and neglect proceedings. Section 41-3-112, MCA. Both statutes list the same general duties that a GAL must fulfill. Section 41-3-425, MCA, also requires the court to appoint an attorney for the child in abuse and neglect proceedings. Williams served as both R.M.T.'s GAL and as R.M.T.'s attorney pursuant to these statutes and the practice in Yellowstone County. Attorneys often serve as a GAL in domestic relations cases. *Jacobsen*, ¶¶ 19-39. The Department argues that the role of an attorney GAL in abuse and neglect proceedings differs from the role of an attorney GAL in domestic relations proceedings.

¶47    The Department contends that the attorney GAL in abuse and neglect proceeding must act primarily as an attorney. The Department argues that the GAL in domestic relations proceedings, by contrast, serves primarily to advise the court regarding the best interest of the child. This distinction evaporates, however, when the attorney GAL submits a written report. Due process requires that a party be allowed to cross-examine the author of a written report presented to the court. *Jacobsen*, ¶ 34.

¶48    Williams, like the GAL in *Jacobsen*, submitted a factual report to the District Court. We decline to draw a distinction between the roles of an attorney GAL in domestic

14

proceedings and an attorney GAL in abuse and neglect proceedings when the GAL submits a factual report to the court. Due process requires the court to allow Father to cross-examine the GAL regarding any factual evidence, especially a written report submitted to the court. *Jacobsen*, ¶ 34.

¶49 The Court in *Jacobsen* ultimately concluded that the district court's decision not to allow the GAL's testimony constituted harmless error. *Id.* at ¶ 35. The report at issue provided the court no new information. *Id.* at ¶ 36. The court's exclusion of the GAL's testimony caused no substantial injustice. *Id.* at ¶ 35.

¶50 Williams's two-page report likewise provided no new information to the court. We recognize that the report contained statements that R.M.T. allegedly had made to Williams regarding his relationship with Father. The court telephoned R.M.T., however, in order to learn directly from R.M.T. how R.M.T. felt about the proceeding and his Father. The District Court's findings rely on no information included in Williams's report that had not been presented through other witnesses who testified at the hearing. As a result, the exclusion of Williams's testimony did not cause substantial injustice to Father. *Id*.

¶51 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ JAMES C. NELSON

Justice James C. Nelson concurs.

¶52    While I concur with the Court's Opinion, my agreement with the Court's decision on Issue 2 is grounded in the following additional rationale.

¶53    Under the applicable statutes, an attorney who is appointed as Guardian Ad Litem (GAL) for a youth in a termination of parental rights case functions as the youth's GAL and not the youth's attorney. The applicable statutes are those found in Title 41, chapter 3, MCA. Section 41-3-112(1), MCA, requires the court to appoint a GAL for any child who is abused or neglected. The GAL "is charged with the representation of the child's best interests" and with certain "general duties" further delineated by this statute. Section 41-3-112(3), MCA.

¶54    Separate from the court's obligation to appoint a GAL for any abused or neglected child, § 41-3-425(2), MCA, requires the District Court to "immediately appoint or have counsel assigned for: . . . (b) any child or youth involved in a proceeding under a petition filed pursuant to 41-3-422." (Section 41-3-422, MCA, sets forth the various requirements for petitions involving protecting a child from abuse and neglect, including termination of the parent-child relationship, § 41-3-422(1)(a)(v), MCA.) Indeed, when the court appoints counsel for the child, it must be accomplished by initially appointing a public defender under the Montana Public Defender Act (Title 47, chapter 1, MCA). Moreover, under § 41-3-

425(3), MCA, the court may appoint counsel *for* a GAL—obviously apart from the attorney who must be appointed for the child in a parental termination action, § 41-3-425(2)(b), MCA. Accordingly, reading §§ 41-3-112 and -425, MCA, together, the plain language of the statutory scheme requires that, where a youth is subject to the termination of his or her parental rights, the trial court must appoint a GAL *and* an attorney for the child.

¶55    The question then becomes can the GAL and the child's attorney be the same person; can one person function in both capacities—GAL and child's attorney. For the following reasons, I conclude that the GAL may not function as the youth's attorney—even if the GAL is an attorney.

¶56    First, as noted above, the District Court's obligation to appoint a GAL and an attorney for the child, comes from two different statutes. The GAL can be a lay person or an attorney, § 41-3-112(3)(g), MCA, so long as the person appointed has "appropriate training that is specifically related to serving as a child's court-appointed representative," § 41-3-112(2), MCA. But, while two different statutes cover the appointment of the GAL and the child's attorney, there is no specific statutory authorization for combining the "general duties" of the GAL under § 41-3-112(3), MCA, and those of the child's attorney (presumably, as grounded in the usual rules and laws pertaining to the attorney-client relationship and the Montana Rules of Professional Conduct) under § 41-3-425(2)(b), MCA. Additionally, while the GAL only needs to appear and participate in proceedings "to the degree necessary" (§ 41-3-112(3)(e), MCA), an attorney's professional obligation to represent the child would, necessarily, require his or her appearance and participation in all proceedings. Thus, at the

17

outset, the Legislature's choice to differentiate the two appointments and the respective duties in the statutory scheme should be respected.

¶57 Second, and probably more importantly, under § 41-3-112(3)(g), MCA, if the GAL is an attorney, she is empowered "to file motions, including but not limited to filing to expedite proceedings or otherwise assert the child's rights." The GAL's power, in this regard, however, is bounded by the overarching statutory charge that the GAL represent "the child's *best interests*." Section 41-3-112(3), MCA (emphasis added).

¶58 Montana law consistently recognizes that there is a difference between what a child may want or "wish" and what is in the child's best interests. *See e.g. Hillard v. Smith (In re Parenting of N.S.)*, 2011 MT 98, ¶ 21, 360 Mont. 288, ___ P.3d ___ (district court did not abuse its discretion when it concluded that it was in the child's best interests that he reside primarily with one parent despite his wish to reside with the other); *In re Marriage of Merriman*, 247 Mont. 491, 495, 807 P.2d 1351, 1354 (1991) (children's express wishes were not determinative of their best interests); *In re Marriage of Arrotta,* 244 Mont. 508, 513, 797 P.2d 940, 943 (1990) (trial court is obligated to award custody of a child based on the child's best interests, not the child's preferences); *accord In re Marriage of Ulland*, 251 Mont. 160, 169, 823 P.2d 864, 870 (1991).

¶59 However, the duty of an attorney is to represent the client's (here the youth's) wishes—irrespective of whether those "wishes" necessarily coincide with the child's "best interests." *See e.g. In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 86, 306 Mont. 1, 29 P.3d 485 (the proper role of the attorney in civil commitment proceedings is to "represent the

18

perspective of the respondent and to serve as a vigorous advocate for the respondent's wishes"); *State v. Joanna V.*, 94 P.3d 783, 786 (N.M. 2004) ("The focus of the GAL's responsibilities is on representing the best interests of the child to the court. . . . [Counsel's role] is to advocate zealously for the client's position. Although counsel may advise the client on counsel's view of the client's best interests, counsel is ultimately required to advance the client's expressed wishes."); *Gallimore v. Gallimore*, 1989 Ohio App. LEXIS 1231 at ** 6-7 (Ohio App. 2d Dist. March 30, 1989) ("The duty of a lawyer to his client and the duty of a guardian ad litem to his ward are not always identical and, in fact, may conflict. The role of guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest. The role of the attorney is to zealously represent his client within the bounds of the law.")

¶60    Accordingly, and based upon the foregoing, I conclude that even if the GAL happens to be an attorney—and while her attorney skill may improve her ability to perform her "general duties" as a GAL and thus better act as the child's court-appointed "representative" (§ 41-3-112(2) and (3), MCA)—such a GAL does not form an "attorney-client" relationship with the child. Rather, instead of advocating for the child's wishes and desires, the GAL must advocate for the child's best interests. Maybe the child's wishes and best interests will coincide, but that is beside the point. Because the child's wishes and best interests may not be the same in any given case, the statutory scheme must be followed. The youth in a termination of parental rights proceeding must be appointed a GAL under § 41-3-112(1),

19

MCA, and, separately, counsel under § 41-3-425(2)(b), MCA. The former's duty is to advocate for the child's best interests; the latter's duty is to advocate for the child's wishes.

¶61 Because there is no attorney-client relationship between the GAL and the child and because the GAL's general duties involve investigations to ascertain facts, interviewing and observing the child, accessing records, making written reports to the court, and making recommendations as to the child's best interests (§ 41-3-112(3), MCA), I conclude that the GAL may be called as and cross-examined as a witness for the State, the parent, or the child.

¶62 With that additional rationale as to Issue 2, I concur in the Court's decision.

/S/ JAMES C. NELSON