

DA 13-0637

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 86N

IN THE MATTER OF:

J.H., J.H., and T.H.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause Nos. DN 12-20A, 12-21A, 12-22A
Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Elizabeth Thomas; Attorney at Law; Missoula, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General; C. Mark Fowler, Appellate Bureau Chief; Helena, Montana

            Ed Corrigan, Flathead County Attorney; Kalispell, Montana

Submitted on Briefs:  March 5, 2014
Decided:  April 1, 2014

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Pursuant to Section I, Paragraph 3(d), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2      On August 21, 2013, the Eleventh Judicial District Court, Flathead County, entered its Findings of Fact, Conclusions of Law, and Order Terminating Parental Rights of Birth Father to J.H.1, J.H.2, and T.H. Mother's rights were not terminated, and she continued working on a permanency plan to have the children returned to her. Father appeals.

¶3      In May 2012, the State filed a Petition for Emergency Protective Services and Temporary Investigative Authority, alleging Father was physically and psychologically abusing the children, employed excessive physical discipline, and was physically abusive to Mother in front of the children. There was also an allegation that Father had sexually abused J.H.1. Mother and Father (Parents) stipulated to temporary investigative authority. The children began attending counseling with separate therapists. Based on the recommendations of the children's therapists, visitation with Father was suspended in October 2012.

¶4      On November 5, 2012, all three children were adjudicated youths in need of care upon stipulation of Parents. T.H. was diagnosed with post-traumatic stress disorder

2

(PTSD), major depressive disorder, and parent/child relational problems. J.H.2 was diagnosed with oppositional defiance disorder and dysthymic disorder. Upon adjudication, J.H.1 was admitted to Shodair Children's Hospital, and was diagnosed with major depressive episodes, severe PTSD, oppositional defiance disorder, and borderline IQ.

¶5 Following adjudication, the State proposed a treatment plan for Father. Prior to this proposed plan, Father had completed a psychological evaluation and participated in weekly counseling, but the proposed plan required Father to complete an additional psychological evaluation and a psychosexual evaluation, participate in individual counseling, refrain from contacting his wife, complete a parenting class, maintain a stable lifestyle, and keep in regular contact with the child protection specialist. Father objected to additional psychological testing, and requested that visitation with the children be reinstated. The court conducted a contested hearing and found that further evaluation was necessary under the circumstances before visitation could be reinstated. The court approved the State's proposed treatment plan.

¶6 Over the next nine months, Father completed two additional psychological evaluations, a psychosexual evaluation, a parenting class, attended weekly therapy, and maintained contact with the child protection specialist. However, Father repeatedly contacted his wife in violation of the court's no contact order, and the State was concerned that he was not able to acknowledge a history of abuse in therapy. On May 24, 2013, the State petitioned to terminate Father's parental rights, alleging that

Father had not successfully completed his treatment plan and that he was unlikely to change within a reasonable amount of time the behaviors that led to removal of his children. A termination hearing was held on August 6, 2013.

¶7    At the hearing, Dr. James Myers, who completed a psychosexual evaluation of Father, testified that it was unlikely Father had sexually abused J.H.1, but that Father's "history of abuse with his wife and children, and his poor prognosis regarding therapy directed at these issues, mitigate against his children being returned to his care anytime soon." Dr. Myers observed that Father did not express much remorse for his actions, and that "prognosis for further improvement is guarded to poor given [Father's] minimization, justification and denial of abusive behavior." Dr. Angela Jez, who conducted a psychological evaluation of Father, testified that Father "demonstrated a limited capacity for insight and appropriate judgment," and "was observed to have a tendency to minimize difficulties and externalize blame." Dr. Jez also predicted that Father's prognosis for change was limited. Dr. Ed Trontel, who conducted psychological evaluations of Father in 2007 and again in 2012, testified that Father described incidents of violence and was unapologetic in describing the situation. Dr. Trontel found Father's prognosis for change doubtful. Jeffrey Scogin, LCPC, Father's regular therapist at the time, testified that Father had made some "pretty good" progress but that "we've got a ways to go." Scogin testified that though the minimization and justification of Father's abusive behaviors had decreased, it still occurred and he would have to redirect Father "a fair amount." Scogin also testified that Father admitted to violating the no contact order

4

pertaining to his wife "on a fairly regular basis." Scogin predicted Father's prognosis for change was good, but felt that visitation with the children was dependent on the recommendations of the children's therapists.

¶8    Marah Connole, therapist for T.H., testified that T.H. had disclosed numerous specific instances of abuse and neglect by Father including being punched and kicked, forced to stand outside in the cold for long periods of time as punishment, and witnessing similar abuse of his mom and siblings. T.H. expressed to Connole that he absolutely did not want contact with Father. Connole testified that contact between T.H. and Father would be detrimental. Jennifer Wihlborg, therapist for J.H.1, testified that anytime Father was brought up in session, J.H.1's behaviors would increase. Wihlborg discouraged any contact between J.H.1 and Father. Kelly Ewalt, therapist for J.H.2, testified that J.H.2 expressed fear of Father and did not wish to have contact with him. Ewalt testified that contact with Father would be detrimental. Child Protection Specialist Rusty Cash testified that though Father had completed most of the requests in the treatment plan, he had not been successful in completing it. He testified regarding his concern due to the lack of progress in therapy and continual minimization of the abuse, as well as the possibility there had been sexual abuse of J.H.1. Though Dr. Myers did not believe the abuse had occurred, Cash testified that the Department still had concerns based on the findings of the professionals who had worked with J.H.1 at Shodair. Cash further testified that no additional services could be offered to alleviate the concerns

regarding Father's ability to parent, and that based on the minimal progress made thus far, it was not likely Father would be a fit parent within a reasonable amount of time.

¶9 Father also testified at the hearing. The District Court noted that Father admitted to hitting his children and his wife, but "offered varying justifications for his conduct." Based on Father's testimony, the court found that "it does not appear that [Father] has acknowledged the damage he has caused to his children through his conduct." The court ultimately found that continuation of the parent-child relationship would likely result in continued abuse and neglect. The court concluded that Father had not successfully completed the treatment plan as ordered, the conduct or condition of Father rendering him unfit was unlikely to change within a reasonable time, reasonable efforts at reunification had been made by the State, and that the best interests of the children would be served by termination of Father's parental rights.

¶10 On appeal, Father claims that the District Court erred in determining the State had made reasonable efforts toward reunification when visitation had been suspended, and in finding that the conduct or condition resulting in the removal of his children was unlikely to change within a reasonable time. With regard to the first issue, Father argues that the children were not made aware of his personal progress on the treatment plan, and that "it was imperative that some repair work be attempted" by the State so that he would be able to show "meaningful success" on his treatment during visits. On the latter issue, Father argues the State failed to prove by clear and convincing evidence that he was unable to change in a reasonable amount of time. He alleges the court's finding was in "direct

6

contradiction" to Scogin's testimony, and the court erred in relying upon the testimony of the other professionals whose information was not as broad or as current as Scogin's.

¶11 "[B]ecause a parent's right to the care and custody of a child is a fundamental liberty interest, the right must be protected by fundamentally fair procedures." *In re T.S.B.*, 2008 MT 23, ¶ 18, 341 Mont. 204, 177 P.3d 429. We review a district court's decision to terminate parental rights for an abuse of discretion. *In re T.S.B.*, ¶ 17. In determining whether there has been an abuse of discretion, this Court looks to see if the district court "act[ed] arbitrarily, without employment of conscientious judgment, or exceed[ed] the bounds of reason resulting in substantial injustice." *In re R.M.T.*, 2011 MT 164, ¶ 26, 361 Mont. 159, 256 P.3d 935 (citation omitted). To satisfy the statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. We review a lower court's findings of fact for whether they are clearly erroneous. *In re T.S.B.*, ¶ 18. A district court's conclusions of law are reviewed for correctness. *In re C.J.M.*, 2012 MT 137, ¶ 10, 365 Mont. 298, 280 P.3d 899. In a parental rights termination proceeding, the physical, mental, and emotional conditions and needs of the child are of paramount concern and take precedence over the parental rights. *In re T.S.B.*, ¶ 19.

¶12 We have determined to decide this case pursuant to Section I, Paragraph 3(d) of our Internal Operating Rules, which provides for noncitable memorandum opinions. The District Court's findings of fact are supported by substantial evidence and the legal issues are controlled by settled Montana law, which the District Court correctly

7

interpreted. The District Court had evidence before it from multiple professionals regarding Father's prognosis for change, and the court was permitted to accept or reject the testimony based upon its credibility determinations. The District Court did not abuse its discretion in ordering termination of Father's parental rights.

¶13 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT