FILED

03/07/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 22-0263

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 39N

IN THE MATTER OF:

A.B.W. and D.L.W.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DN-18-87A
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Gregory D. Birdsong, Birdsong Law Office, Santa Fe, New Mexico

      For Appellee:

          Austin Knudsen, Montana Attorney General, Bjorn Boyer, Assistant Attorney General, Helena, Montana

          Travis R. Ahner, Flathead County Attorney, Katherine Handley, Deputy County Attorney, Kalispell, Montana

Submitted on Briefs:  January 11, 2023

Decided:  March 7, 2023

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 D.S.M. (Mother) appeals the April 7, 2022 Order, issued by the Eleventh Judicial District Court, Flathead County, terminating her parental rights to A.B.W. and D.L.W. (the children). We affirm.

¶3 Mother raises two issues on appeal:

1. Whether Mother's due process right was violated when the District Court could not produce a recording or transcript of the August 31, 2020 Adjudication Hearing.

2. Whether the District Court erred when it did not require the Child and Family Services Division (the Department) to provide a modified treatment plan resulting in the termination of Mother's parental rights.

¶4 Mother's history with the Department began in April 2018 when D.L.W.'s father, T.W., was alleged to have made sexual advances towards Mother's eldest daughter, M.M. The Department discontinued its involvement when M.M. moved in with her maternal grandmother.

¶5 In August 2018, the Department became involved again when Mother's then-boyfriend, J.M., tested positive for methamphetamine while on probation. In September

2018, Mother and the Department agreed to a voluntary placement plan and the children were placed with a family friend. At that time, Mother admitted to methamphetamine use, suicidal ideation, and being involved in an abusive relationship. The Department referred Mother for drug testing at Compliance Monitoring Systems (CMS), but CMS had difficulty reaching her.

¶6 In November 2018, the Department filed its first petition for Emergency Protective Services (EPS) and Temporary Investigative Authority (TIA). Mother stipulated and the District Court granted TIA to the Department for 90 days. The children were again placed with a family friend. In February 2019, the court granted the Department's motion to dismiss the case since Mother completed the Department's requirements for reunification. After the District Court's dismissal, the children were returned to Mother.

¶7 In February 2020, the Department filed a second petition for EPS and adjudication of the children as Youth in Need of Care (YINC). The petition was supported by an affidavit by the Department's caseworker Caleb Peterson (Peterson) alleging neglect and exposure of unreasonable risk of physical or psychological harm by Mother and her boyfriend. Specifically, Peterson alleged that Mother's boyfriend, J.H., had punched her in the eye. Peterson further alleged that Mother appeared to be under the influence of drugs during his interaction with her, although she denied use. Mother agreed to a voluntary placement where the children were placed with a family friend. The District Court granted EPS and adjudicated the children as YINC. In May 2020, the District Court dismissed the Department's petition citing a lack of reliable information from the Department.

3

¶8 In June 2020, the Department filed a third petition for EPS and adjudication of the children as YINC after receiving reports of abuse and neglect. Following an investigation by the Department's caseworker A.J. Gamma (Gamma), the District Court held an adjudication hearing and learned that D.L.W. was treated for an abscess on his neck caused by an untreated tooth infection. As a result of the infection, D.L.W. underwent emergency surgery and was hospitalized for three days. Additionally, D.L.W. had a rash caused by a bacterial infection. During D.L.W.'s hospitalization, Gamma visited Mother's residence where she witnessed three adults passing an unresponsive A.B.W. between themselves. Mother then left the house and told Gamma that A.B.W. was not breathing and she was taking her to the emergency room. Gamma called 911 and then went to the emergency room where Mother was present without A.B.W. and learned that Mother tried to discharge D.L.W. Mother then refused to disclose A.B.W.'s location or if A.B.W. had received medical care. Mother stated that A.B.W. was on a plane out of Montana. Deputies located A.B.W. in Bigfork at a residence known for methamphetamine use. Gamma took A.B.W. to the hospital and A.B.W. had a fever and was diagnosed with a bladder infection.

¶9 The District Court also heard testimony about Mother's ability to parent. Nicolle Roth (Roth), a pediatric social worker at Kalispell Regional Hospital, testified she thought Mother ignored her children's medical needs to avoid involvement with the Department. Further, Dr. Dooley testified about his concern over the children's missed medical appointments and Mother's medical neglect. Based on the reports from Gamma and the testimony received, the District Court granted EPS and adjudicated the children as YINC,

granting the Department Temporary Legal Custody (TLC) for six months. This was the third removal in two years by the Department.

¶10 In September 2020, the District Court held a treatment plan hearing and approved a treatment plan addressing areas of concern such as parenting, chemical dependency, and mental health. The treatment plan further identified tasks to be completed by Mother which included receiving a mental health evaluation and following its recommendations, maintaining stable housing, keeping the children away from drug usage, maintaining stability and contact with children, and maintaining income and employment. Mother, who was represented by counsel, did not sign the treatment plan but verbalized her understanding of the plan.

¶11 Over the following months, Mother made little progress on her treatment plan. She failed to attend regular visits and was arrested on a justice court warrant. Mother sought treatment at Gateway Community Services (Gateway) and Sunburst Mental Health (Sunburst) in accordance with her treatment plan. At Gateway, Mother completed an evaluation and tested positive for methamphetamine. She was diagnosed with a methamphetamine and opioid use disorder. Caseworker Tamara Eads (Eads) reached out to Gateway, Sunburst, and Oxytocin Clinic (Oxytocin) and learned Mother was no longer engaging with services. Eads had difficulty reaching Mother as Mother had changed her phone number and was not present at her home for several weeks. Mother again made progress when she moved into Peggy's House and submitted to random drug testing.

Mother also agreed to engage in treatment at Oxytocin for her therapy and mental health needs.

¶12 In February 2021, the Department requested an extension of TLC due to Mother's lack of progress on her treatment plan. In March 2021, the District Court relinquished jurisdiction of the matter to Treatment Court. However, Mother missed her Treatment Court hearing and tested positive for methamphetamine. Mother was no longer engaging in treatment at Oxytocin and was subsequently discharged. Mother then moved into Peggy's House. In May 2021, the District Court extended TLC for six months. Mother missed two more Treatment Court hearings and when she returned, she reported her housing and employment were unstable. Mother was not engaged in treatment and was not consistent with her visitation with the children.

¶13 In August 2021, Mother was still inconsistent in appearing for Treatment Court hearings and was still not engaged in treatment. She denied having a substance abuse disorder and was discharged from Treatment Court. Mother also left Peggy's House after behaving erratically and hitting herself. Mother continued to miss visitation and was suspended for missing scheduled visits. In September 2021, the Department again filed to extend TLC due to Mother's lack of progress on the treatment plan and Mother stipulated. The court extended TLC.

¶14 In December 2021, Mother was late to a visitation and it was cancelled. Mother again began hitting herself after learning of the cancellation, which was recorded on surveillance cameras.

¶15    In March 2022, the Department filed a Petition for Permanent Legal Custody and Termination of Parental Rights.  The Petition was supported by an affidavit by the Department's caseworker Jodi Black-Fucci (Black-Fucci).  The affidavit recounted the case history and addressed Mother's inability to follow the treatment plan.  Black-Fucci cited Mother's unaddressed mental health issues and continued use of methamphetamine, as well as inconsistency in visitation, as evidence of Mother's inability to parent. Black-Fucci further noted that these concerns were unlikely to change in a reasonable time.

¶16    In April 2022, a Termination Hearing was held. The District Court concluded that Mother had not completed her treatment plan and was unfit due to her substance abuse issues, erratic mental health, and lack of consistent housing.  The District Court also concluded that these concerns were unlikely to change within a reasonable time.  In its Order, the District Court provided extensive Findings of Fact to support its decision to terminate Mother's parental rights to both children.  Mother appeals.  We restate the issues Mother raises and address each in turn.

¶17    Mother argues her due process right was violated when the District Court could not produce a recording or transcript of the August 31, 2020 Adjudication Hearing.  Whether a parent's right to due process has been denied is a question of constitutional law over which this Court's review is plenary.  Due process of law is guaranteed by the Fifth Amendment to the United States Constitution and Article II, Section 17, of the Montana Constitution.  A parent's right to the care and custody of a child constitutes a fundamental liberty interest that must be protected by fundamentally fair procedures.  *In re T.S.B.*, 2008

MT 23, ¶ 18, 341 Mont. 204, 177 P.3d 429. Proceedings involving the termination of the parent-child relationship must meet due process requirements guaranteed by the Montana and United States Constitutions. *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, 87 P.3d 408. Fundamental fairness and due process require that a parent not be placed at an unfair disadvantage during the termination proceedings. *In re A.S..*, ¶ 34. We review for an abuse of discretion a district court's termination of parental rights. A district court abuses its discretion when it "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re R.M.T.*, 2011 MT 164, ¶ 26, 361 Mont. 159, 256 P.3d 935. We review a District Court's findings of fact to determine whether they are clearly erroneous. *In re D.B.*, 2007 MT 246, ¶ 18, 339 Mont. 240, 168 P.3d 691. We review a district court's conclusions of law to determine whether they are correct. *In re D.B.*, ¶ 18.

¶18 Mother argues her right to due process was violated when the District Court was unable to locate the recording of the adjudication hearing which occurred on August 31, 2020. She further argues reconstruction of this record is untenable as the hearing was a contested adjudication, making the evidence "nuanced and voluminous." Finally, Mother maintains the record provided is insufficient for appellate review as the adjudication order entered by the District Court is not a complete and accurate record of the hearing.

¶19 The State argues that Mother has not availed herself of the statutory process to reconstruct the hearing provided by the Montana Rules of Appellate Procedure. The State maintains that the available record, including the District Court's Order, is sufficient for

8

appellate review and Mother has not established how she was prejudiced by the unavailability of portions of the record.

¶20 The Montana Rules of Appellate Procedure provides a process for remedying an unavailable record. A record may be reconstructed by the parties filing a "joint written statement and stipulation of the unavailable evidence[.]" M. R. App. P. 8(7)(b). Additionally, a party may file a motion with the District Court to "prepare a statement of the unavailable evidence from the best available means. . . ." M. R. App. P. 8(7)(c). Following either option, the district court may hold a hearing and issue an order adopting or rejecting the statement of unavailable evidence. Here, Mother did not avail herself of the statutory process to reconstruct the hearing. Mother chose not to engage in the fundamentally fair process outlined by M. R. App. P 8(7) to reconstruct the record and therefore cannot claim her due process right was violated.

¶21 Although Mother did not avail herself of the process for reconstructing the record, the available record is nonetheless sufficient to assess whether the adjudication proceeding was proper. During the first day of the hearing, Roth testified about the sores present on D.L.W. during his hospital stay that required emergency surgery. Roth's testimony included conversations with Mother that included Mother indicating her intent to take D.L.W. to Tennessee to avoid further involvement with the Department.

¶22 Although the record for August 31, 2020, cannot be located, the Findings of Fact made by the District Court are extensive and incorporated testimony and affidavits of witnesses from the adjudication hearing. The District Court's findings summarized

9

testimony provided by Dr. Dooley, who initiated the Department's involvement over concerns of medical neglect and delay in care. Additionally, the District Court relied on Gamma's affidavit. We conclude Mother's right to due process was not violated by the missing portion of the transcript.

¶23 Mother also argues the District Court erred when it did not require the Department to provide a modified and appropriate treatment plan which addressed her significant substance abuse issues. Mother argues, as a result, she was left unable to successfully engage in and complete her treatment plan. Mother asserts that the treatment plan should have been modified to include her substance abuse issues once the Department was made aware to the extent of these issues.

¶24 The State argues that although the treatment plan did not explicitly require a chemical dependency evaluation or treatment, the results of the required mental health evaluations incorporated the requirement to obtain a chemical dependency evaluation and treatment. Further, the State maintains abstention from drug use was clearly required and understood by Mother, albeit her inability to adhere. Finally, the State maintains the evidence overall demonstrated Mother's unwillingness to accomplish any aspect of her treatment plan, which was unlikely to change in a reasonable amount of time—all of which was relied upon by the District Court.

¶25 By statute, every treatment plan must identify the problems or conditions that resulted in the abuse or neglect of the child and treatment goals and objectives that will address those conditions. Section 41-3-443(2), MCA. The problems facing both the parent

10

and the child should also be considered in determining whether a treatment plan is appropriate. *In re M.M.*, 271 Mont. 52, 894 P.2d 298 (1995). The statute addressing treatment plans specifically lists the requirement that the parent "obtain and follow through with alcohol or substance abuse evaluation and counseling, if necessary" as a permissible provision in a treatment plan. Section 41-3-443(3)(d), MCA.

¶26 Here, the treatment plan addressed the initial areas of concern that led to the removal of the children but did not explicitly address Mother's substance abuse issues. One area of concern the treatment plan addressed was Mother's mental health issues due to her vocalized suicidal ideation and tendency to self-harm. Regarding mental health, the treatment plan stated "D.S.M. will complete a Mental Health Evaluation and follow recommendations, including recommendations that may lead to a higher level of care." To address this issue, Mother was required to complete a mental health evaluation and follow the recommendations of the evaluation. As a result, Mother completed two psychological evaluations and was diagnosed with a severe methamphetamine abuse and opioid disorder. After Mother received these diagnoses, the treatment plan was not modified to include chemical dependency treatment.

¶27 "Where a parent fails to object to a treatment plan in a timely manner, the parent waives any argument regarding the propriety of the treatment plan." *In re C.J.M.*, 2012 MT 137, ¶ 16, 365 Mont. 298, 280 P.3d 899. The treatment plan was approved in September 2020. Mother was represented by counsel. Although Mother did not sign the treatment plan, she did not object to issues or requirements of the treatment plan. In the

11

hearing addressing the treatment plan, the District Court reviewed the general provisions of the treatment plan. Mother apologized for her noncompliance and made no objection to the treatment plan. The District Court then approved the treatment plan. Mother never objected to the treatment plan, thus waiving her argument under *C.J.M.*

¶28 We nonetheless will address the merits of Mother's claim. The criteria for a termination of parental rights, includes an "appropriate" treatment plan that the parent failed to comply with, and the parent is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. Due to the uniqueness of each case, this Court has not specifically defined what constitutes an "appropriate" treatment plan as a matter of law. *In re A.C.*, 2001 MT 126, ¶ 26, 305 Mont. 404, 27 P.3d 960. When evaluating the appropriateness of a treatment plan this Court generally considers whether: (1) the parent was represented by counsel, (2) the parent stipulated to the treatment plan, and (3) the treatment plan takes into consideration the particular problems facing both the parent and child or children. *In re C.J.M.*, ¶ 15.

¶29 We admit that it is difficult to understand why the treatment plan did not expressly require treatment for her substance abuse issues when "there was no doubt in anyone's mind that it was required." However, the treatment plan's omission of that requirement does not render it inappropriate. Here, Mother was represented by counsel at the treatment plan hearing and did not object to the treatment plan. The treatment plan appropriately considered the particular problems experienced by Mother. The treatment plan required Mother to receive a mental health evaluation and follow the recommendations of the

12

evaluation. Mother received two evaluations, the first at Gateway and the second at Sunburst. The provider at Sunburst recommended Mother attend therapy every other week, and Mother reported she was engaged in intensive outpatient drug treatment. Mother does not dispute the Department's requirements that she engage in treatment for her substance abuse disorder, but rather argues that these requirements should have been explicitly identified in a modified treatment plan.

¶30 The Department identified Mother's substance abuse as a source of Mother's "erratic behavior," further linking her substance abuse issues to her identified mental health concerns. The tasks identified in the treatment plan required Mother to be substance free around her children and required Mother to not allow anyone who was using drugs, including herself, to be around the children. Additionally, the Department referred Mother for drug testing where she consistently tested positive or refused to submit altogether. Following the recommendation of her mental health evaluation, Mother attended intensive outpatient treatment at Oxytocin, but left after testing positive for methamphetamine. Although the treatment plan did not specify chemical dependency treatment as a requirement, the plan sufficiently addressed Mother's issue with substance abuse. We conclude the plan was appropriate.

¶31 Finally, the District Court's Termination Order relied on Mother's inability to show progress in the two years that services were provided to her. The Order specifically acknowledged Mother's inability to consistently attend visitation, maintain consistent housing, and remain mentally stable. We have long held that "the best interests of the

13

children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re D.A.*, 2008 MT 247, ¶ 21, 344 Mont. 513, 189 P.3d 631. A child's need for a permanent placement in a stable, loving home supersedes the right to parent a child. *In re D.A.*, ¶ 21. For that reason, the law requires that "[i]f a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights." Section 41-3-604(1), MCA.

¶32 Our review of the record shows termination of Mother's rights was supported by sufficient evidence. The children had already been out of Mother's care for 20 months, giving rise to the statutory presumption that their best interests were served by termination of Mother's rights. Section 41-3-604(1), MCA. There was ample evidence in the record acknowledging Mother's inability to follow her treatment plan. Finally, Mother's lack of sobriety was only one of many contributing factors leading the District Court to conclude termination of her rights was necessary. While the treatment plan did not explicitly require a chemical dependency evaluation or treatment, the mental health evaluation and treatment required Mother to remain drug free and follow recommendations provided by the mental-health evaluations. The District Court's termination decision rested on the best interests of the children and Mother's inability to complete any aspect of her treatment plan within a reasonable amount of time.

¶33 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the

14

Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶34 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE